J-S24032-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: V.E., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: H.E., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 207 WDA 2025 |

Appeal from the Order Entered January 23, 2025
In the Court of Common Pleas of Washington County Orphans' Court at
No(s): OC-2024-01485

| | | |
|---|---|---|
| IN RE: ADOPTION OF: A.E., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: H.E., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 288 WDA 2025 |

Appeal from the Order Entered January 23, 2025
In the Court of Common Pleas of Washington County Orphans' Court at
No(s): OC-2024-01486

BEFORE: NICHOLS, J., McLAUGHLIN, J., and LANE, J.

MEMORANDUM BY LANE, J.:                    **FILED: September 26, 2025**

H.E. ("Mother") appeals from the orders involuntarily terminating her parental rights to her sons, A.E. (born in January 2012), and V.E. (born in March 2013) (collectively, "the Children").[1] After careful review, we affirm.

---

[1] The Children's father, J.E., executed a consent for the voluntary termination of his parental rights, and has not appealed or filed a brief in this appeal.

We glean the following factual and procedural history from the certified record. Washington County Children and Youth Services ("CYS") received a report relating to the Children on October 24, 2022.[2] On that date, Mother had been arrested at around 1:40 a.m., at a location approximately one hour away from home, after being stopped for aggressive driving. *See* N.T., 1/2/25, at 38, 69, 75-76, 97. An outstanding warrant had been pending against Mother since 2021 on a firearms charge. *See id*. at 92-93, 97. Additionally, at the time of her arrest, a firearm was found in Mother's vehicle without the proper permit. *See id*. at 38.

Following Mother's arrest, the Children, then nine and ten years old, along with their siblings, K.E. and B.E., were discovered alone without supervision in the home.[3] *See id*. at 38, 69, 76. The report further alleged that the home was in "deplorable condition[]," so much so that the local police refused to enter the premises. *Id*. at 38; *see also id*. at 69. Specifically,

_____

[2] The family had been known to CYS for approximately six months prior to the issuance of the report due to allegations relating to, *inter alia*, truancy and hygiene concerns, and in-home services were instituted. *See* N.T., 1/2/25, at 75; *see also* Exhibit CYS-6, Shelter Care Order, 10/26/22, at 4.

[3] K.E. and B.E. are not subjects of this appeal. Nevertheless, we note that K.E., who was then thirteen years old, is autistic. *See* N.T., 1/2/25, at 69-70. Further, B.E., who is A.E.'s twin, has, *inter alia*, "severe" developmental delays. *Id*. at 15. B.E. is non-communicative, unable to walk, and not toilet trained. *See id*. at 14, 33, 70. When found in the home on October 24, 2022, "B.E. was located in a room by himself on the third floor . . . . An ambulance was called to assist in removing him from the home. He was covered in feces and had to be cleaned up prior to being taken out of the home." *Id*. at 77.

there was trash, open containers of food, and feces throughout the home. *See* N.T., 1/2/25, at 77.

On the same date, CYS obtained protective custody of the Children and their siblings, and they were removed from the home and placed with their paternal grandparents. *See id*. at 62, 65, 100, 105-06; *see also* Exhibit CYS-1, Confirmation of Verbal Order for Emergency Protective Custody, 10/24/22. V.E. was ultimately placed in a local pre-adoptive foster home on June 1, 2023. *See* N.T., 1/2/25, at 39, 40, 59-60, 63. A.E. was placed separately in a pre-adoptive foster home on November 22, 2023, in East Stroudsburg, Pennsylvania, which is a driving distance of five hours from Washington County. *See id*. at 39-40, 57-58, 63.

The court adjudicated the Children dependent on January 23, 2023, and established their respective permanency goals as reunification with concurrent goals of adoption. *See id*. at 40, 76; *see also generally* Exhibit CYS-6. In furtherance of reunification, the court ordered Mother to, *inter alia*, "complete a parenting education curriculum, . . . secure safe, clean, and stable housing, [and] attend interactional and individual evaluation[s] with [the C]hildren and follow all recommendations." N.T., 1/2/25, at 40. The court additionally provided for supervised visitation, which we address further *infra*. *See id*. at 51, 106; Exhibit CYS-6, Order of Adjudication and Disposition – Amended, 1/23/23, at 3.

Dr. Neil Rosenblum ("Dr. Rosenblum"), a clinical psychologist, conducted interactional and individual evaluations in February 2023, and December 2024.[4] *See* N.T., 1/2/25, at 12, 30. Significantly, Dr. Rosenblum diagnosed Mother with: post-traumatic stress disorder; unspecified depressive disorder; cannabis use disorder; stimulant use disorder; borderline and paranoid personality traits; history of adult antisocial behavior; history of relationship distress with spouse or intimate partner; and parent-child relational problem. *Id*. at 13. As a result, in addition to that which had been ordered by the court, Dr. Rosenblum recommended Mother engage in non-offenders counseling, outpatient trauma therapy, and substance abuse counseling.[5] *See id*. at 13, 40-41.

Throughout the ensuing dependency proceedings, the court conducted permanency review hearings at regular intervals. By permanency review orders entered in May and September 2023, the court deemed as moderate both Mother's compliance and progress with the permanency plan. *See id*. at 46, 55, 65; *see also* Exhibit CYS-6. However, our review reveals that Mother's performance regressed to minimal compliance and eventually to no

---

[4] Dr. Rosenblum's reports, dated March 2, 2023, and December 15, 2024, were marked and admitted as CYS Exhibits 8 and 9. *See* N.T., 1/2/25, at 8-9.

[5] The court, in turn, updated its reunification directives to require non-offenders counseling, outpatient trauma therapy, and substance abuse counseling, as well as twice per month drug screens. *See id*. at 43.

progress in January and April 2024. Mother's performance then regressed further to no compliance and no progress in July 2024, where it remained up through October 2024. *See id*. at 47-50, 55-56; *see also* Exhibit CYS-6. On September 19, 2024, the Children's respective permanency goals were changed to adoption. *See* Exhibit CYS-6, Permanency Review Orders, dated 3/29/23 and 9/19/24.

On October 7, 2024, CYS filed petitions to involuntarily terminate Mother's parental rights to the Children, then twelve and eleven years old, respectively, pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). By orders entered on October 7, 2024, the court appointed Benita Thompson, Esquire ("Attorney Thompson"), as the Children's guardian *ad litem* ("GAL"), which was in the same capacity that she had represented the Children in the parallel dependency proceedings.[6]

---

[6] Our Supreme Court has ruled that this Court must conduct a *sua sponte* review to ensure that the orphans' court has properly appointed counsel to represent the legal interests of children in contested termination proceedings in conformity with 23 Pa.C.S.A. § 2313(a). *See In re Adoption of K.M.G.*, 240 A.3d 1218, 1234-36 (Pa. 2020). When counsel is appointed to represent a child's legal interests as well as child's best interests as GAL, this Court must also *sua sponte* review whether "the orphans' court determined that the child's best interests and legal interests did not conflict." *Id*. at 1236 (observing that a single attorney cannot represent a child's best interests and legal interests if those interests conflict). In this case, there was no indication in the record that the orphans' court either appointed separate counsel to represent the Children's legal interests, or made a determination that no conflict existed between Children's best and legal interests such that Attorney Thompson could represent both interests. Rather, at the subject hearing, Jessica Johnson, Esquire, stood in for Attorney Thompson as the sole representative
*(Footnote Continued Next Page)*

- 5 -

The orphans' court held an evidentiary hearing on CYS's petitions on January 2, 2025. CYS presented the testimony of Dr. Rosenblum, who was stipulated as an expert in clinical psychology, and Justin Faloshey ("Caseworker Faloshey"), a CYS caseworker. Additionally, Mother, who was present and represented by counsel, testified on her own behalf. Both CYS and Mother proffered exhibits, which the court admitted. The GAL further presented the report of the Children's court-appointed special advocate ("CASA").[7] By orders dated January 23, 2025, the orphans' court involuntarily terminated Mother's parental rights to the Children pursuant to section 2511(a)(2), (5), (8), and (b), and provided a contemporaneous opinion.

_____

for the Children. Because the court failed to first determine whether the Children's best interests and legal interests conflicted, in contravention of **K.M.G.**, this Court remanded to the orphans' court with instructions to undertake such a determination and submit a supplemental statement. **See** Order, 7/28/25, at 2-3. The orphans' court complied and confirmed to this Court that no conflict existed between the Children's best and legal interests. **See** Order, 8/11/25. Thus, the orphans' court satisfied its mandate pursuant to section 2313(a) and **K.M.G.**

[7] We note with displeasure that the exhibits from this proceeding were not originally included with the certified record. While ultimately received pursuant to this Court's above-referenced remand order, we observe that the prior dependency orders related to V.E. are not included. **See** Order, 7/28/25, at 2. Given the other evidence available, including the prior orders related to A.E., this does not hamper our meaningful review. However, we pointedly remind counsel that "[i]t is the obligation of the appellant to make sure that the record forwarded to an appellate court contains those documents necessary to allow a complete and judicious assessment of the issues raised on appeal." **Bennyhoff v. Pappert**, 790 A.2d 313, 318 (Pa. Super. 2001); **see also** Pa.R.A.P. 1921 Note (providing that the ultimate responsibility for a complete record rests with the party raising an issue that requires appellate court access to record materials).

Mother filed a timely notice of appeal,[8] along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The orphans' court thereafter authored an opinion pursuant to Rule 1925(a)(1).

Mother raises the following issue for our review: "Whether the [orphans'] court erred in terminating the parental rights of Mother despite her successfully being discharged from treatments; despite Mother completing drug and alcohol counseling; and despite Mother being consistent in both visiting Children and being in contact with Children?" Mother's Brief at 3 (unnecessary capitalization omitted).[9]

_____

[8] As Mother improperly filed a single notice of appeal for both cases, this Court directed her to file amended notices of appeal, one for each of the Children's orphans' court dockets. ***See Commonwealth v. Walker***, 185 A.3d 969, 977 (Pa. 2018) (requiring appellants to file separate notices of appeal when a single order resolves issues arising on more than one lower court docket); ***Commonwealth v. Young***, 280 A.3d 1049, 1057 (Pa. Super. 2022) (holding when there is ***Walker*** defect in appeal to which Pa.R.A.P. 902 applies, the default position is to allow correction of the defect unless good cause is shown by the opposing party). Mother complied with this Court's directive, and this Court then consolidated Mother's appeals *sua sponte*.

[9] We note with disapproval that there are several procedural deficiencies in Mother's brief. First, Mother fails to cite to the certified record in the statement of the case and argument sections of her brief. ***See*** Pa.R.A.P. 2117(a)(4); ***see also*** Pa.R.A.P. 2119(c). Second, organizationally, in the argument section of her brief, Mother offers headings and points of separation, but they do not mirror the specific distinct issue raised in her statement of questions involved. ***See*** Pa.R.A.P. 2119(a). However, as we are able to discern the issue raised and related arguments, and we perceive no prejudice, we proceed with the merits of Mother's appeal. ***See*** Pa.R.A.P. 2101 (providing that briefs shall conform in all material respects with the requirements of these rules and,
*(Footnote Continued Next Page)*

Our standard of review in this context is well-established:

> In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.
>
> An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.
>
> In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa. Super. 2022) (internal citations and quotation marks omitted).

---

if the defects are in the brief of the appellant and are substantial, the appeal may be quashed or dismissed).

The involuntary termination of parental rights is governed by section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination under section 2511(a). *Id*. at 830; *see also* 23 Pa.C.S.A. § 2511(a)(1)-(11). If the orphans' court determines that the petitioner has established grounds for termination under one of these subsections by "clear and convincing evidence," the court then assesses the petition pursuant to section 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013); *see also* 23 Pa.C.S.A. § 2511(b). This Court need only agree with the trial court's determination as to any one subsection of section 2511(a), in addition to section 2511(b), in order to affirm termination. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

In light of this latitude, we analyze the orders involuntarily terminating Mother's parental rights to the Children pursuant to section 2511(a)(2) and (b),[10] which provide as follows:

---

[10] Given our disposition relative to section 2511(a)(2), we need not review or assess the orphans' court's findings with respect to section 2511(a)(5) and (8). *See B.L.W.*, 843 A.2d at 384; *see also In re K.R.*, 200 A.3d 969, 979 (Pa. Super. 2018) (*en banc*) (observing this Court may proceed to a review of one subsection of section 2511(a) "[w]ithout considering the orphans' court's determinations" under any other subsection).

- 9 -

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \* \*

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. . . ..

23 Pa.C.S.A. § 2511(a)(2), (b).

To establish the applicability of section 2511(a)(2), the party petitioning for termination must prove: "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." ***In re Adoption of A.H.***, 247 A.3d 439, 443 (Pa. Super. 2021) (citation omitted). Grounds for termination pursuant to section 2511(a)(2), however, "are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." ***Id***. (citation omitted). We have long

recognized that "[p]arents are required to make diligent efforts towards the reasonably prompt assumption of full parental duties." *Id*. (citation omitted).

Here, in challenging the orphans' court's finding of grounds for termination under section 2511(a)(2), Mother emphasizes her progress and completion of select court-ordered services. *See* Mother's Brief at 4. While acknowledging that the Children "could not live with her" at the time of the subject hearing, Mother argues that she, *inter alia*, "successfully completed mental health treatment [at Southwestern Pennsylvania Human Services ("SPHS")] on August 23, 2023, and six (6) months prior to the removal of [the C]hildren, had completed drug and alcohol counseling at the same facility." *Id.*

Based on our review, the record reveals that Mother did complete a drug and alcohol assessment and intervention class, but she completed these **prior** to the Children's adjudication. *See* N.T., 1/2/25, at 44, 96; *see also* Exhibit CYS-1, Permanency Review Order, 9/26/23, at 5. In addition, Caseworker Faloshey testified that Mother was **unsuccessfully discharged** from mental health treatment in August 2023. *See* N.T., 1/2/25, at 41-42. Indeed, the record supports the court's finding that Mother failed to participate in "nearly all" of the services ordered for purposes of reunification. Opinion and Order, 1/23/25, at 12; *see also* N.T., 1/2/25, at 40-50, 71. Specifically, although Caseworker Faloshey testified that Mother successfully completed a parenting program in May 2023, the court continued to direct Mother to complete

parenting education and noted a lack of completion and/or documentation related thereto. *See* N.T., 1/2/25, at 41; *see also* Exhibit CYS-6. Further, as noted, Mother was discharged unsuccessfully from mental health treatment in August 2023, and, by her own admission, she was noncompliant following another evaluation in February 2024. *See* N.T., 1/2/25, at 41-42, 47, 49-50, 66-67, 78, 115-17, 119; *see also* Exhibits CYS-6 and CYS-12. Caseworker Faloshey testified, "every time I got reports from SPHS . . . [Mother] was noncompliant, got discharged for noncompliance, and she wasn't attending all of her sessions. . . ." N.T., 1/2/25, at 65-66. Similarly, Caseworker Faloshey indicated that Mother did not complete drug and alcohol counseling subsequent to the Children's adjudication, despite repeated directives. *See id*. at 44-45, 49-50, 78-79. In fact, Mother was noncompliant with outpatient drug and alcohol treatment following an evaluation in January 2024, and her drug and alcohol case was closed on June 1, 2024. *See id*. at 49, 110-15, 119; *see also* Exhibits CYS-11 and CYS-13. According to Caseworker Faloshey, Mother continued to either not appear for screening or test positive for marijuana and/or alcohol when she was screened.[11] *See* N.T., 1/2/25, at 45, 47, 50, 81-82. Additionally, Mother was "resistant" to housing assistance

_____

[11] Mother failed to appear for thirty-seven of forty-nine drug and alcohol screens, and tested negative for all substances on only one occasion. *See* N.T., 1/2/25, at 44, 82. Mother last tested positive for marijuana and alcohol at a court hearing in October 2024, the same month in which CYS filed its termination petitions, and Mother did not have a medical marijuana card. *See id*. at 44, 50, 81.

through her current in-home service provider and did not have stable and appropriate housing. *Id*. at 42, 48-49, 80-81. Mother also did not participate in non-offenders counseling.[12] *See id.* at 45, 48-50, 66.

Moreover, the record further reveals "substantial" deficits in Mother's parenting and protective capacity related to her mental health. *Id*. at 21. Specifically, Dr. Rosenblum testified to Mother's "extensive period of neglect" of the Children and their siblings and her "exceptionally poor judgment." *Id*. at 14. As noted *supra*, Dr. Rosenblum explained that "Mother would leave the boys home alone for extended hours at a time," despite B.E. "having severe developmental and mental health problems, being nonverbal, and not even toilet trained." *Id*. He described this as "a pattern of severe neglect, which Mother would justify by saying she had to work but, again, not making -- glaringly, not making appropriate arrangements for the supervision of the boys. It also led to several of the boys being truant from school as a result of her poor judgment and inability to support their educational needs." *Id*. (cleaned up). Dr. Rosenblum concluded that Mother has a "limited or partial understanding" of the consequences of these actions and is "not emotionally able to take an adequate degree of responsibility or recognize the severe danger" she placed the Children in while in her care. *Id*. at 16-17.

---

[12] Both Caseworker Faloshey and Dr. Rosenblum questioned Mother's assertion that there was an extended waiting period for non-offenders' treatment. *See id*. at 15, 45-46, 100.

Dr. Rosenblum testified that Mother failed to address her mental health diagnoses, discussed above. Specifically, he indicated that Mother failed to comply with substance abuse treatment, trauma therapy, and non-offenders therapy, as recommended. *See id*. at 29-30. Dr. Rosenblum explained that non-offenders counseling "would allow Mother to develop a more appropriate appreciation for the problems that she created for her youngsters when she was neglecting their needs." *Id*. at 25. He further stated that Mother discontinued mental health counseling, had not maintained compliance with drug screens, and continued to use marijuana. *See id*. at 15-16.

Consequently, Dr. Rosenblum testified that these diagnoses "all contribute to [Mother's] inability to parent and her lack of protective capacity." *Id*. at 24. He stated that they, "[i]n combination, create a major degree of concern about Mother's ability to parent." *Id*. at 27. Significantly, Dr. Rosenblum highlighted "[t]he combination of these various mental health concerns, the chronicity of them, the fact that they go back to her childhood years and very much compromise[] her ability to feel good about herself, her judgment, and, again, her lack of attention and inability to address these concerns over the past year and a half." *Id*.

Given the record before us, we discern no abuse of discretion by the orphans' court in terminating Mother's parental rights pursuant to section 2511(a)(2). The record amply supports the orphans' court's conclusion that Mother's repeated and continued incapacity, neglect, or refusal has caused

the Children to be without essential parental care, control or subsistence necessary for their physical and mental well-being. *See A.H.*, 247 A.3d at 443. Moreover, the record confirms that the causes of Mother's incapacity, neglect or refusal cannot or will not be remedied. *See id*. More than two years after the removal of the Children, Mother had failed to complete the court-ordered services necessary to achieve reunification, and her parental incapacity in connection with her mental health diagnoses persisted. Thus, we conclude that the record supports the orphans' court's conclusion that clear and convincing evidence for termination existed pursuant to section 2511(a)(2).

Having determined that there are grounds for termination under one subsection of section 2511(a), we now turn to a review of the court's findings pursuant to section 2511(b), which gives "primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b); *see also T.S.M.*, 71 A.3d at 267. Our Supreme Court has generally outlined this inquiry, as follows:

> [C]ourts should consider the matter from the child's perspective, placing [their] developmental, physical, and emotional needs and welfare above concerns for the parent.
>
> Accordingly, the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis. We have observed the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. Thus, the court must determine each child's specific needs.

- 15 -

Moreover, the child's emotional needs and welfare include intangibles such as love, comfort, security, and stability. As further guidance, we have identified factors, *i.e.*, specific needs and aspects of the child's welfare, that trial courts must always consider. The courts must consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents. And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which is not always an easy task.

*Interest of K.T.*, 296 A.3d 1085, 1105-06 (Pa. 2023) (cleaned up).

"The extent of any bond analysis . . . necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008) (citation omitted). However, our Supreme Court has concluded that "only a necessary and beneficial" parental bond should be maintained. *K.T.*, 296 A.3d at 1009. A bond is considered to be "necessary and beneficial" if its severance would cause "extreme emotional consequences" or significant, irreparable harm. *Id*. at 1109-10. This Court has recognized that,

concluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent. . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and its mental and emotional health than the coincidence of biological or natural parenthood.

- 16 -

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted).

Furthermore, "bond, plus permanency, stability and all 'intangible' factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and thus are all of 'primary' importance in the [s]ection 2511(b) analysis." *K.T.*, 296 A.3d at 1109. Therefore, it is "within the discretion of the orphans' court to prioritize the safety and security" of children "over their bonds with their parents. *M.E.*, 283 A.3d at 839 (cleaned up).

Instantly, Mother asserts that severing her relationship with the Children does not serve their developmental, physical, and emotional needs and welfare pursuant to section 2511(b). *See* Mother's Brief at 6. Specifically, she claims that she has visited with the Children and that they "have shown affection toward her." *Id*. Thus, she asserts that "taking her rights away is no benefit to the Children." *Id*. In addition, Mother argues that the court abused its discretion in terminating her parental rights pursuant to section 2511(b) because she has complied with court-ordered services. *See id*.

The orphans' court found that, although there existed a bond between the Children and Mother, it was a "trauma bond," and not necessary or beneficial. Opinion and Order, 1/23/25, at 21. Rather, the Children "moved on" and forged "genuine bonds" with their foster families who provide for their

daily needs and with whom they are "thriving." ***Id***. at 21-22. As we explain, this determination is supported by the certified record.

During the course of the Children's dependencies, while the court provided for supervised visitation, such visitation was noted as inconsistent and never progressed beyond requiring supervision. ***See*** N.T., 1/2/25, at 15, 55, 67, 74. Specifically, Mother was initially provided supervised visitation two days per week for two hours. ***See id***. at 51, 106; ***see also*** Exhibit CYS-6, Order of Adjudication and Disposition – Amended, 1/23/23, at 3. Following A.E.'s placement in his current foster home five hours away in November 2023, Mother only visited A.E. on two occasions. ***See*** N.T., 1/2/25, at 15, 20-21, 28, 68. According to Caseworker Faloshey, because of the distance, such visitation transitioned to phone and/or video visitation two days per week for "up [to] 30 minutes duration." ***Id***. at 51; ***see also id***. at 106. However, he testified that Mother missed more than half (nine of seventeen) of these phone and/or video visits and that, as a result, A.E. had declined to speak with Mother. ***See id***. at 51, 54-55, 85.

Likewise, Mother's attendance at visitation with V.E. also became inconsistent, despite his proximity. ***See id***. at 15, 23, 67. As best we can discern, in approximately April 2024, Mother was discharged for noncompliance by the original provider, after she missed four consecutive visits. ***See id***. at 53, 67, 73-74. Then, in approximately September 2024, the court reduced Mother's visitation with V.E. to one time per week with a

new provider. *See id*. at 23, 53, 55, 67, 85-86, 107. Such visitation was to be line of sight and hearing, and at V.E's discretion. *See id.* at 51.

Although Dr. Rosenblum testified that the Children shared a bond with Mother, he explained that this bond is a "trauma bond" where "the bond or the relationship hasn't consistently supported or met the [C]hildren's needs." *Id*. at 20. Dr. Rosenblum observed,

> The Children are both comfortable with [M]other. They both are obviously very familiar with [M]other. But for the past year and a half, she has not been very involved in the boys' lives, and, in my clinical opinion, the boys have moved on and formed more primary attachments to the people who have cared for them in a very meaningful, consistent, and supportive manner.

*Id*. While conceding that the Children enjoy seeing Mother and that she cares about them, Dr. Rosenblum testified that Mother's ability to respond to the Children's needs is lacking. *See id*. at 21. Specifically, he pointed to deficits in Mother's parenting and protective capacity, as discussed *infra*. *See id*.

In contrast, V.E. has been placed with his current foster parents since June 2023. *See id*. at 39, 59-60. A.E. has been placed with his current foster parents since November 2023. *See id*. at 39, 57-58. Both homes are pre-adoptive. *See id*. at 40, 63. Caseworker Faloshey testified that the Children are "overall doing well and excelling." *Id*. at 62.

Dr. Rosenblum indicated that the Children want to be adopted and remain in their foster homes. *See id*. at 17; *see also* N.T., 10/28/24, at 6, 16 (*in camera* permanency review hearing testimony of Children expressing their desire to be adopted); Exhibit GAL-A at unnumbered 2, 5 (CASA report

noting Children's desire to be adopted). Dr. Rosenblum stated that the Children are "very well-connected" with their foster parents and families. *See* N.T., 1/2/25, at 18; *see also id*. at 17. Dr. Rosenblum opined that "without a doubt, the [Children] . . . benefit[] from secure foster family placements which have been very attentive and responsive to [their] needs." *Id*. at 19; *see also id*. at 40. He described V.E. as "very wound up, very excitable, [and exhibiting] difficulty concentrating" with Mother, whereas he was "able to focus, engage in activities . . ., and required a limited degree of redirection" with his foster parents." *Id*. at 18. He further observed that A.E. is the only child and "primary area of focus" of his foster parents and "has benefitted from this amount of attention." *Id*. at 19.

Accordingly, Dr. Rosenblum testified that it would be detrimental to the Children if they were removed from their current foster homes. *See id*. at 35. He stated, "[b]oth boys show significant forward progress in their development and their ability to relate well to other children, their ability to engage in supportive activities. None of these things were happening when they lived with Mother. So[,] . . . I would say there would be reason for severe regression [if they were removed from their current placements]." *Id*.

Likewise, Caseworker Faloshey testified that the Children are happy and want to remain in their foster homes. *See id*. at 54, 63, 88-89. He indicated that it is the Children's foster parents who ensure that their needs are being met on a daily basis. *See id*. at 59, 61. Notably, the Children each have been

diagnosed with attention deficit hyperactivity disorder for which they take medication and have active individualized education plans. *See id*. at 58-59, 61-62, 79. While Mother is opposed to medicating the Children, both Children reported that the medication helps them. *See* N.T., 1/2/25, at 87; *see also id*. at 30. Additionally, V.E. receives tutoring services, and A.E. is engaged in in-school therapy. *See id*. at 58, 61. As such, Caseworker Faloshey opined that the Children are "doing great" and deserve permanency. *Id*. at 63-64. Further, both Dr. Rosenblum and Caseworker Faloshey testified that adoption is indeed in the Children's best interests. *See id*. at 21, 63-64.

Based on the foregoing, we discern no abuse of discretion by the orphans' court's conclusion that termination of Mother's parental rights will serve the Children's developmental, physical, and emotional needs pursuant to section 2511(b). The record amply demonstrates by clear and convincing evidence that Mother and the Children do not share a necessary and beneficial relationship. *See K.T.*, 296 A.3d at 1109-10, 1113. Instead, the Children share a beneficial relationship with their foster parents. While Mother may profess to love the Children, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *See In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (citation omitted).

Accordingly, we affirm the order involuntarily terminating Mother's parental rights to Children pursuant to section 2511(a)(2) and (b).

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


DATE:  09/26/2025